**HCA HEALTH SERVICES OF VA, INC., a Virginia Corporation, t/a Henrico Doctors Hospital, Richmond Community Hospital, Inc., a Virginia non-stock Corporation, and Richmond Eye and Ear Hospital, a Virginia non-stock Corporation, Plaintiffs,**

v.

**METROPOLITAN LIFE INSURANCE CO., a New York Corporation, and Met-Life Healthcare Management Corp., a Delaware Corporation, Defendants.**

Civ. A. No. 90–00285–R.

United States District Court,
E.D. Virginia,
Richmond Division.

Dec. 7, 1990.

Gregory Joseph Haley, William Raymond Rakes, Gentry, Locke, Rakes & Moore, Roanoke, Va., for plaintiffs.

Laura Graham Fox, John Bowers McCammon, Wright, Robinson, McCammon, Osthimer & Tatum, Richmond, Va., for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

RICHARD L. WILLIAMS, District Judge.

Plaintiffs, who are institutional health care providers in the Richmond area, have sued for declaratory and injunctive relief. Plaintiffs contend that their exclusion from participation in Metropolitan's preferred provider organization violates Virginia Code § 38.2–3407. Specifically, they claim that the defendants violated the statutory provision by failing to establish nondiscriminatory terms and conditions for the qualification of the Hospitals as preferred providers and refusing to negotiate with the Hospitals regarding their inclusion in Met–Elect on nondiscriminatory terms and conditions. Plaintiffs ask the Court to enjoin the Defendants from implementing and operating Met–Elect or any other preferred provider subscription program in the Richmond area until they establish and offer reasonable, nondiscriminatory terms and conditions for qualification as preferred providers.

This case came before the Court for a bench trial on the merits on November 29, 1990. As detailed below, the Court finds that the selection procedures implemented and employed by Metropolitan in establishing its PPO do not unreasonably discriminate against or among preferred providers. To the contrary, they reflect sound business determinations about the type and number of health care providers to include in a limited network designed to reduce the astronomical costs of health care for its customers' employees. Pursuant to Rule 52(b) of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law. The parties' stipulations are incorporated by reference.

### I. FINDINGS OF FACT

*Parties*

1. Plaintiff HCA Health Services of Virginia, Inc., a wholly owned subsidiary of Hospital Corporation of America, operates Henrico Doctors' Hospital. At the time of Metropolitan's PPO negotiations, plaintiffs Richmond Community Hospital, Inc. and Richmond Eye and Ear Hospital were managed by a subsidiary of HCA. Stipulations 6, 7, 8.

2. Defendant MetLife Healthcare Management Corp., a subsidiary stock corporation of Metropolitan Life Insurance Company, owns and operates Met–Elect, the Preferred Provider Organization that is the subject of this lawsuit. The defendants

will be collectively referred to as "Metropolitan". Stipulations 10, 11, 13.

*Background*

3. A Preferred Provider Organization (PPO) is a health care system that operates by inducing institutional and other providers to provide services at reduced cost in exchange for membership in a limited provider network. Membership in such a network results in increased patient volume, stimulated in turn by the provision of lower-cost services for plan participants at the institutions that constitute the network of preferred providers. Stipulation 12.

4. The exclusion of some providers is a necessary prerequisite of a limited provider network. It is by limiting the number and types of providers included in a PPO that an insurer is able to implement cost reductions in services for health beneficiaries.

5. The establishment of PPO's has helped to stem the tide of steadily increasing health care costs in this country.

*Establishment of Met–Elect*

6. In March, 1988 Metropolitan conducted a feasibility study to determine whether the Richmond area would be a suitable environment for the establishment of Met–Elect. Trial Exhibit 1; Stipulation 21.

7. During the summer of 1988, Metropolitan initiated the development of a hospital provider network to support Met–Elect in Richmond. Program Manager Laura Ostroff was primarily responsible for this effort. Stipulation 23.

8. Met–Elect's major prospective customers in Richmond were Reynolds Metals Company and Sovran Financial Corporation. Stipulation 24.

9. Initially, Metropolitan reviewed the Richmond area and identified four "Service Areas": 1) Fan/Downtown/East End, 2) Northside, 3) West End, and 4) Southside. A Service area is a discrete geographic area in which one or more general acute care hospitals are located which are reasonably accessible to residents of that area. Generally, two or more hospitals compete for the same patient population within that area. Trial Exhibit 3; Stipulations 14, 15, 16, 31.

10. Metropolitan customarily limits its network to one provider per service area. Stipulation 17.

11. Metropolitan anticipates that a hospital will increase its market share if it is selected as the only provider in the service area for participation in Met–Elect. The opportunity to increase its market share provides a hospital with an incentive to discount its services. Stipulation 18.

12. Metropolitan then instituted a two-phased selection process to determine which hospitals to include in its limited network. Both phases involved a comparative evaluation of hospitals by "Service Area" according to Metropolitan's "Selection Criteria". Stipulation 26.

13. Metropolitan's Selection Criteria are: geographic location relative to the prospective employee population; range of services; cost efficiency; historical utilization; willingness to comply with medical management and utilization review; anticipated level of medical staff's interest in the PPO; strength of staff; and price. Accreditation is an absolute criterion. Stipulation 27.

14. Phase One, also known as "short listing", consisted of a comparative evaluation of Richmond hospitals on the bases of geographic convenience, range of services, cost-efficiency, and historic utilization. Specifically, the compilation of a short list involved the following steps: a) identifying all accredited hospitals in the targeted geographic area that provide general acute care services; b) identifying the service area of each hospital; c) identifying the number of individuals covered by Metropolitan that were admitted to each hospital the previous year and the total benefits paid for patients; d) calculating each hospital's cost-efficiency based on a case mix adjusted analysis of the cost of care for inpatients covered by Metropolitan at each hospital; e) identifying the number of patients admitted to each hospital who were covered by Metropolitan or were employees of prospective customers Reynolds Metals and Sovran. Trial Exhibits 2, 3; Stipulations 29, 30.

15. Short-listing does not require interaction with the hospitals; it is accomplished by analyzing available data. Trial Exhibits 2, 3; Stipulation 37.

16. Phase One of Metropolitan's selection process resulted in the following list of Richmond hospitals that were eligible for further consideration:

| | |
|---|---|
| MCV | (Service Area 1) |
| Retreat Hospital | (Service Area 1) |
| Richmond Memorial Hospital | (Service Area 2) |
| Henrico Doctors' Hospital | (Service Area 3) |
| St. Mary's Hospital | (Service Area 3) |
| Chippenham Hospital | (Service Area 4) |
| Johnston–Willis Hospital | (Service Area 4) |

Trial Exhibit 3; Stipulation 35.

17. With the exception of Service Area 2, each service area was represented on the short list by two hospitals. Trial Exhibit 3; Stipulation 35. Although the Medical College of Virginia serves the residents of Service Area 1, it was also regarded as a region-wide facility because of its reputation as a teaching hospital and because it provides tertiary care for most services. Stipulation 35.

18. Metropolitan derived the following cost efficiency factors for each hospital on the short list through a case-mix analysis of claims data:

| | | |
|---|---|---|
| MCV | 1.00 | (Service Area 1) |
| Retreat Hospital | .86 | (Service Area 1) |
| Richmond Memorial Hospital | .90 | (Service Area 2) |
| Henrico Doctors' Hospital | 1.13 | (Service Area 3) |
| St. Mary's Hospital | .93 | (Service Area 3) |
| Chippenham Hospital | .83 | (Service Area 4) |
| Johnston–Willis Hospital | 1.13 | (Service Area 4) |

The average cost efficiency factor is 1.0. According to Metropolitan's methodology, the higher the cost-efficiency factor, the less cost-efficient the hospital. Trial Exhibit 2, 3; Stipulation 36.

19. The plaintiff Richmond Eye and Ear Hospital was excluded from the short list because it did not provide the required range of services. Richmond Eye and Ear is a specialty hospital rather than a general acute care hospital. Stipulation 33.

20. The plaintiff Richmond Community Hospital was excluded from the short list because it failed to satisfy the historical utilization criterion. The Hospital has, in the past, admitted an insufficient number of patients covered by Metropolitan or employed by Reynolds and Sovran. Stipulation 34.

21. Phase Two of Metropolitan's selection process consisted of price negotiations with individual hospitals on the short list. In August of 1988, Metropolitan extended written invitations to each of the eligible hospitals to negotiate on the basis of price for participation in the network. The letters explained the structure and purpose of Met–Elect and described its selection criteria. Trial Exhibit 5; Stipulation 40.

22. Metropolitan held preliminary negotiation meetings with each of the seven hospitals in September, 1988. Program Manager Laura Ostroff served as the Metropolitan negotiator at most of these meetings. The meetings were conducted in accordance with a "Negotiation Script" which explained Metropolitan's selection methodology and proposed a targeted per diem rate for each hospital. These per diem target rates ranged from $450.00 to $525.00. In accordance with its negotiation strategy, Metropolitan proposed target prices which were lower than the prices then being charged by the respective institutions. Metropolitan expected to negotiate a firm price with providers. Trial Exhibit 6, 7, 8, 9, 11, 12; Stipulation 41.

23. Metropolitan prepared a memorandum of each of the initial meetings with the selected hospitals. Trial Exhibits 7, 8, 9, 11, 12. Stipulation 42.

24. After the September meetings, Ms. Ostroff reevaluated the service area designations and decided to merge areas 1 and 2. Stipulation 43.

25. Metropolitan continued to negotiate with the short-listed hospitals throughout the fall of 1988. Stipulation 44.

*Negotiations with Henrico Doctors' Hospital*

26. On September 14, 1988, Ms. Ostroff met with Ernest C. Padden, consultant to Henrico Doctors' Hospital, Chippenham Hospital, and Johnston–Willis Hospital. Prior to December, 1988, the three hospitals, wholly owned subsidiaries of HCA, negotiated as a unit. They intended to

refuse to participate in Met–Elect unless all three hospitals were included in the network. Trial Exhibit 7; Stipulations 45, 46.

27. At the September 14th meeting, Metropolitan's representative informed the hospital administrators and consultant that their best offers were due September 27, 1988 and that the provider network was to be in place by January 1, 1989. Trial Exhibits 6, 7.

28. Metropolitan also proposed a specific per diem rate for each of the three hospitals.

29. The HCA negotiator informed Metropolitan that the hospitals would only consider a discounted rate approach. Trial Exhibit 7.

30. HCA submitted financial proposals on behalf of its three hospitals in a letter dated September 26, 1988. The offer indicated that Henrico Doctors' Hospital would be willing to discount its inpatient charges by 10 percent and its outpatient charges by 5 percent; Johnston–Willis Hospital and Chippenham Hospital offered to reduce their inpatient charges by 7.5 percent and 8.5 percent, respectively, and their outpatient charges by 5 percent. Trial Exhibit 14; Stipulations 47, 48.

31. Metropolitan informed HCA that its proposed discounts were inadequate. In a letter dated November 8, 1988, Ms. Ostroff informed Mr. Padden that Metropolitan wanted to finalize the financial and contractual agreements with the selected hospitals as soon as possible in order to have an operational network by January 1, 1989. Ms. Ostroff requested that a revised offer be submitted by November 11, 1990. Trial Exhibit 17; Stipulation 49.

32. HCA submitted a revised proposal in a letter dated November 11, 1988. The revised offer was substantially the same as the initial offer, with the exception of an increase in the discounts on inpatient charges if Metropolitan admissions exceeded 700 in the first contract year. Trial Exhibit 19; Stipulations 50, 51.

33. In late November, 1988, Chippenham and Johnston–Willis Hospitals severed their relationship with Henrico Doctors' Hospital and continued negotiations with Metropolitan as a two-hospital unit. The two parties reached a price agreement in December, 1988. Metropolitan was forced to make an exception to its rule against including more than one hospital in a service area because the two Service Area 4 hospitals refused to negotiate independently. Stipulation 53.

34. After HCA's second offer had been made, Metropolitan informed Henrico Doctors' Hospital that it would need to discount inpatient charges 28 percent in order to remain competitive with St. Mary's Hospital, the other qualified hospital in Service Area 3. Trial Exhibit 21; Stipulations 52, 55.

35. Henrico Doctors' Hospital submitted its final proposal in a letter dated December 12, 1988. The offer included a "15% discount for the first $750,000 gross covered inpatient charges ... with [a] 20% discount for subsequent inpatient bills paid in a calendar year." Trial Exhibit 25; Stipulations 56, 57.

36. Metropolitan rejected Henrico Doctors' Hospital's offer in a letter dated December 15, 1988. Trial Exhibit 27; Stipulation 59.

37. In letters dated December 14, 1988 Metropolitan invited the following hospitals to participate in Met–Elect:

| | |
|---|---|
| MCV | (Service Area 1–2) |
| Retreat Hospital | (Service Area 1–2) |
| St. Mary's Hospital | (Service Area 3) |
| Chippenham Hospital | (Service Area 4) |
| Johnston–Willis Hospital | (Service Area 4) |

Trial Exhibit 26; Stipulation 60.

38. St. Mary's Hospital contracted with Metropolitan to discount its published inpatient charges by 12 percent. Trial Exhibit 59.

39. Given that St. Mary's is a nonprofit hospital and more cost-efficient than Henrico Doctors' Hospital, a profitable institution, it is not surprising that it was able to offer a greater discount.

## II. CONCLUSIONS OF LAW

1. Plaintiffs' claim for declaratory relief is authorized by 28 U.S.C. § 2201.

2. This Court has jurisdiction of this case, pursuant to 28 U.S.C. § 1332(a)(1).

■ 3. Virginia Code Section 38.2–3407 requires insurers offering or administering health benefit programs to establish "terms and conditions" of participation in a limited provider network. The language of the statute suggests that an insurer has considerable latitude in determining the manner in which it selects preferred providers for its PPO. The statute does not define "terms and conditions" but rather implies that such terms are variable and dependent upon the specific context in which a PPO is established.

4. The Court finds that the selection criteria used by Metropolitan to devise a short list of eligible providers with which Metropolitan would engage in price negotiations are the functional equivalent of statutorily required terms and conditions.

5. The Court finds that the exhibits objected to by the defendants, which indicate that Metropolitan's selection criteria were not explicitly defined as terms and conditions until negotiations had been completed and this lawsuit initiated, are of some probative significance. However, since the selection criteria served the same function as terms and conditions, Metropolitan's reliance on these criteria did not violate § 38.2–3407.

6. The statute does not mandate *nondiscriminatory* terms and conditions. Rather, it prohibits *unreasonable* discrimination against or among providers. Reasonable discrimination between providers is necessary to establish a limited network that can effectively reduce costs by inducing hospitals to lower prices in exchange for a greater market share.

■ 7. The precise meaning of "unreasonable discrimination" as it is used in § 38.2–3407 is a matter of first impression.

8. The division of a territory into service areas that reflect the population usage of providers does not inherently unreasonably discriminate against or among providers.

9. In *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins.* (1986), the Seventh Circuit Court of Appeals dealt with a similar statute. Although the Court avoided a definitive interpretation of the statute with respect to geographic discrimination, it implied that some geographic distinctions and limitations on the number of preferred providers in a particular area would serve a useful and legitimate purpose. "In some cases", the Court noted, "the savings in cost may depend on the ability to direct patients to a particular hospital, the better to use its facilities fully. This may require reducing the number of hospitals in the PPO plan in a given city." 784 F.2d 1325, 1342–3.

10. Henrico Doctors' Hospital has not established that but for the division of Richmond into discrete service areas from which only one provider would be chosen it would have been given a PPO contract.

11. Neither the exclusion of institutional providers that deliver specialized rather than general acute care services nor the exclusion of providers whose services have not been heavily utilized in the past by the insurer's beneficiaries unreasonably discriminates among providers for the purpose of establishing a PPO.

12. Section 38.2–3407 further provides that price differences produced by a process of individual negotiation shall not be deemed unreasonable discrimination. An insurer is not required to offer the same price terms to all providers. Such a requirement would "make hash of the idea of a PPO ... The requirement that hospitals bid in order to get the plan's business is the principal source of the incentive to cut costs, and the prospect of getting more business by becoming a preferred provider is the principal benefit to a hospital." *Ball*, 784 F.2d at 1343.

■ 13. Metropolitan's proposal at the onset of negotiations of a targeted per diem rate that is lower than the prices charged by the hospitals is a valid negotiating technique.

■ 14. Metropolitan fulfilled its legal duty by establishing and communicating to all providers with which it negotiated the selection criteria used to devise a short

list of eligible providers. Indeed, Metropolitan surpassed its legal duty by informing Henrico Doctors' Hospital that it would have to offer a 28 percent discount to match its competitor's offer. *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins.*, 784 F.2d 1325, 1344 (7th Cir.1986) (insurer not required to give information about the bids made by other hospitals or specify what discount would be sufficient; such a requirement would undermine the inducement to bid down to marginal cost created by the seller's uncertainty about how low is low enough). Henrico Doctors' Hospital was legitimately excluded from Metropolitan's PPO because it would not meet the necessary price term and not because of unreasonable discrimination.

15. Henrico Doctors' Hospital was given ample opportunity to respond with a competitive offer.

16. The Court's finding that Metropolitan's selection criteria constitute terms and conditions which do not unreasonably discriminate among providers renders the laches, unclean hands, and ERISA preemption defenses asserted by the defendant moot.

It is so ORDERED.